### GUS CURCIO *v.* DANIEL BAX ET AL.
### (AC 28065)

Gruendel, Harper and Berdon, Js.

Argued January 8—officially released March 11, 2008

*Nathalie Feola-Guerrieri*, with whom, on the brief, was *Daniel Shepro*, for the appellant (plaintiff).

*Anthony M. Macleod*, for the appellees (defendants).

*Opinion*

GRUENDEL, J. The plaintiff, Gus Curcio, sought damages under General Statutes § 49-8 (c),[1] a temporary and

---

[1] General Statutes § 49-8 (c) provides in relevant part: "The mortgagee or plaintiff or the plaintiff's attorney, as the case may be, shall execute and deliver a release within sixty days from the date a written request for a release of such encumbrance (1) was sent to such mortgagee, plaintiff or plaintiff's attorney . . . . The mortgagee or plaintiff shall be liable for damages to any person aggrieved at the rate of two hundred dollars for each week after the expiration of such sixty days up to a maximum of five

permanent injunction requiring the defendants, Daniel Bax and Katherine Bax, to execute a release of the security on a promissory note and a judgment that he is not liable to the defendants for further payments. The trial court rendered judgment in favor of the defendants. From that judgment, the plaintiff appeals. He claims that the court improperly concluded that he was not entitled to a credit against the purchase price when it (1) erroneously found that he was not entitled to credits for certain debts and (2) failed to include a credit against the purchase price for sales tax in interpreting the parties' settlement agreement.[2] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the plaintiff's appeal. On June 18, 2001, the plaintiff and the defendants entered into a settlement agreement under which the plaintiff purchased from the defendants 100 percent of the stock and some of the assets of the Bax Group, Inc. (corporation), a Connecticut corporation doing business as Charity Technologies, for $475,000. The purchase price was to be paid by a nonrefundable deposit in the amount of $100,000, a certified or bank check in the amount of $175,000 and a promissory note in the amount of $200,000. The promissory note contained two early payoff provisions. Relevant to this appeal is § 1 (d) of the promissory note, which provides that if the plaintiff pays the defendants

thousand dollars or in an amount equal to the loss sustained by such aggrieved person as a result of the failure of the mortgagee or plaintiff or the plaintiff's attorney to execute and deliver a release, whichever is greater, plus costs and reasonable attorney's fees."

[2] The plaintiff also claims that the court improperly interpreted the parties' settlement agreement (1) to require him to pay scheduled debts before receiving a credit against the purchase price, and (2) to require the promissory note be paid in cash and not by a credit against the purchase price. Because we conclude that the court's finding that the plaintiff was not entitled to a credit against the purchase price was proper, we need not address those claims.

$102,500 on or before July 31, 2001, then the balance due shall be fully satisfied and the defendants shall mark the note as paid in full and return it to the plaintiff.

Section eight of the settlement agreement provides that the plaintiff will assume certain corporation debts and liabilities, which do not exceed an agreed estimated amount. If the actual debts exceed the agreed estimated amount by more than $15,000, the plaintiff will be entitled to a credit against the purchase price. Section eight of the settlement agreement provides in relevant part: "Buyer understands that [the corporation] owes debts (and such debts of Sellers that were utilized for [corporation] business) that total approximately $1,425,000 as of June 18, 2001 and as set forth in schedule 3. . . . While Sellers have made a good faith attempt to list all [corporation] debts as of the date of this Agreement, it is understood and agreed that Sellers shall not be considered to have materially breached this Agreement in the event that any debt is understated by $5,000 or less, or if in the aggregate they failed to disclose or understate [corporation] debts of up to a maximum of $15,000. Accordingly, Buyer shall not be entitled to a set-off or credit in the purchase amount for the foregoing debts unless the aggregate exceeds the amount of $1,425,000.00 (less $75,000 paid from Seller's funds) plus $15,000 but Buyer shall be entitled to a credit or reimbursement for any excess of $1,440,000."

In a letter dated July 30, 2001, the plaintiff notified the defendants that, after calculating the corporation's actual debts, he discovered that they exceeded the estimated debts listed in schedule three by at least $102,500, the amount due under the early payoff provision contained in the promissory note. He therefore requested that the credit he was owed be used to satisfy the promissory note in full. In October, 2001, the plaintiff sent the defendants a second letter in which he estimated that the actual debt exceeded the estimated debt

by \$162,395.22. When the defendants did not apply the calculated credit to the note and release the mortgage, the plaintiff commenced an action for damages under § 49-8 (c), an injunction to compel the defendants to release the security on the promissory note and a judgment that he was not liable for future payments to the defendants. After a trial to the court, the court found that the plaintiff was not entitled to a credit against the purchase price and that he had not tendered \$102,500 on or before July 31, 2001, in accordance with the note's early payoff provision. Therefore, the court ruled that the plaintiff was not entitled to a release of the security on the note, and, consequently, he was not entitled to damages pursuant to § 49-8 (c) or a judgment that he was no longer liable to the defendants for further payments. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that several of the court's findings of fact regarding whether he was entitled to a credit against the purchase price were clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Doody* v. *Doody*, 99 Conn. App. 512, 517, 914 A.2d 1058 (2007). We conclude that there is evidence in the record to support each challenged finding.

The plaintiff's July 30, 2001 letter included a list of debts for which the plaintiff claimed a credit against the purchase price. The plaintiff claimed that the actual amounts of twenty-four debts listed on schedule three exceeded the estimated amounts by enough to warrant a credit against the purchase price, in accordance with

§ 8 of the agreement. On appeal, the plaintiff claims that the court made improper findings regarding the difference between the estimated debt and the actual debt for the following items: property taxes, accrued payroll, two American Express debts, May and June commissions, consulting services, commission check corrections, a Verizon check and unemployment payments.[3]

The court found that the plaintiff failed to provide evidence to substantiate his claimed credits for property taxes, May commissions and Connecticut unemployment benefits payments. Specifically, the court found that the plaintiff failed to provide the court with any tax bills as proof of the claimed property tax debt, the calculation of the May commissions debt was fraudulent[4] and the plaintiff failed to provide the court with any other valid evidence for it to use to determine the amount of credit, if any, to which the plaintiff was entitled, and the plaintiff failed to prove that he paid the employees or the state the claimed unemployment benefits debt. On appeal, the plaintiff merely recites the estimated debt for each item and the actual debt as calculated by him, as proof that he was owed a credit for each item. He does not offer any reason as to why the court's findings were clearly erroneous. Because the plaintiff failed to refer this court to any evidence that refutes the trial court's findings, we conclude that those findings are not clearly erroneous.

[3] The court found that nine of the debts listed by the plaintiff were not disputed by the defendants. The plaintiff includes eight of these undisputed debts in his claim on appeal. Because the court recognized these eight debts as undisputed and factored them into the amount owed to the plaintiff when it calculated whether the plaintiff was owed a credit against the purchase price, we will not address them.

[4] The plaintiff conceded at trial that his computer consultant simply multiplied the April commissions by 1.1 to calculate the claimed May commissions debt.

The court also found that the plaintiff was not entitled to his claimed credit for accrued payroll. When calculating the accrued payroll debt, the plaintiff used gross pay amounts as opposed to net pay amounts. The defendants testified that the federal and state tax debt for accrued payroll was listed as a separate debt on schedule three. Consequently, when the defendants listed the accrued payroll debt on schedule three, they listed it as a net pay amount as opposed to a gross pay amount. The court found that the plaintiff was not entitled to a credit for the amount of the claimed debt because it was the difference between the gross pay amount and the net pay amount, which was listed on schedule three as a separate tax debt.[5] As there was evidence to support the court's finding, it is not clearly erroneous.

The court found that the plaintiff was not entitled to a credit for the claimed American Express debt in excess of that listed on the agreement because he admitted at trial that § 8 of the agreement provides that he will indemnify the defendants and hold them harmless from American Express debt totaling not more than $135,000. The court found that the claimed debt did not exceed $135,000, and so the plaintiff was not entitled to a credit for the debt. As there was evidence to support the court's finding, it is not improper.

The court found that the plaintiff was not entitled to a credit for commissions owed in June, 2001, prorated for the eighteen days in June prior to the closing. Although the agreement provided for an estimated amount for May commissions, it did not provide that the defendants would be responsible for a prorated amount for June commissions. The court found that

---

[5] The defendants conceded that the actual net accrued payroll exceeded the estimated net accrued payroll amount by $708.11. The court factored this amount into its calculation of excess debt in determining whether the actual debt exceeded the estimated debt to the extent that the plaintiff was entitled to a credit against the purchase price.

because the agreement controls, the plaintiff was not entitled to the claimed debt. As there was evidence from which the court could make this finding, it, too, is not clearly erroneous.

Regarding consulting services, the plaintiff provided the court with invoices as well as a consulting service agreement. The service agreement provided that the services were performed for both the plaintiff and the defendants and that both were to give approval and authorization for services. On the basis of this evidence, the court found that the plaintiff and the defendants were responsible for the consulting service debt. Consequently, the plaintiff was entitled to half of his claimed excess debt for this item. In light of the foregoing, the court's finding is not clearly erroneous.

The court also found that the plaintiff's claim for a commission check corrections debt was invalid because the debt was not contemplated by schedule three. The court determined that the corrections were the result of fraudulent calculations made by the plaintiff's computer analyst for May commissions. The fraudulent calculations for May commissions resulted in additional commissions checks being sent to certain customers. The court found that the agreement did not state that the defendants were responsible for calculating May commissions and that they should not be held liable for the results of the fraudulent calculations. Again, as there was evidence in the record to support this finding, it is not clearly erroneous.

Last, the court found that the plaintiff was not entitled to a claimed credit for a check returned by Verizon because this debt was disclosed on schedule six of the agreement as part of the outstanding operations budget. As there was evidence to support the court's finding, it is not clearly erroneous.

## II

The plaintiff next claims that the court improperly interpreted the agreement to provide that the Connecticut sales tax audit liability was a postclosing debt that he agreed to assume and for which he could not claim a credit.

The standard of review for the interpretation of a contract is well established. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [when] there is definitive contract language, the determination of what the parties intended by their . . . commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Bristol v. Ocean State Job Lot Stores of Connecticut, Inc.,* 284 Conn. 1, 7, 931 A.2d 837 (2007). "A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Kline v. Kline,* 101 Conn. App. 402, 408, 922 A.2d 261, cert. denied, 284 Conn. 901, 931 A.2d 263 (2007). In the present case, the language of the settlement agreement concerning Connecticut sales tax audit liability is clear and definitive. Accordingly, our review of the court's interpretation of the agreement involves a question of law over which our review is plenary.

The court found that, according to the language of the agreement, Connecticut sales tax audit liability was not a debt pursuant to § 8, for which the plaintiff could claim a credit against the purchase price. Rather, pursuant to § 10 of the agreement, it was a postclosing obligation that the plaintiff agreed to assume. Section ten of

the agreement provides in relevant part: "The parties agree that on and after the closing date, all expenses of [the corporation's] business operations, including, but not limited to . . . sale and use tax liability, including contingent liability arising from any audit relating to the post-closing periods or pre-closing period . . . shall be assumed by [the corporation]." The plaintiff claims that even though the debt is provided for in § 10, it is still a debt listed on schedule three, and, as such, any amount that exceeds the estimated amount on schedule three should be applied to a credit against the purchase price. The court found that although listed on schedule three, the sales and use tax audit liability is not a debt pursuant to § 8. Section eight provides in relevant part: "Buyer understands that [the corporation] owes debts . . . that total approximately $1,425,000 as of June 18, 2001 and as set forth in schedule 3." The debts, therefore, contemplated by § 8 are those set forth on schedule three and those that figure into the total of $1,425,000. As the plaintiff contends, the debt for sales tax audit liability is listed on schedule three. It is listed, however, as a liability separate from the other debts that total $1,425,000.[6] Therefore, according to the plain language of § 10, as well as the plain language of § 8, the credit claimed by the plaintiff, although appearing on schedule three, is not a debt pursuant to § 8 for which the plaintiff can claim a credit. The court, therefore, properly found that the plaintiff was not entitled to the claimed debt as a credit.

After resolving the plaintiff's claims regarding debts in excess of the amount agreed to, the court calculated the difference between the estimated debt listed on schedule three and the actual debt, which was comprised of the undisputed debt and half of the debt for

---

[6] This figure is a closing date estimate of debt. The actual total listed on schedule three is $1,419,479.28. It is clear from the agreement that the contingent use and sales tax liability estimate was not factored into either amount.

consulting services. The court determined that the amount by which the actual debts exceeded the estimated debts was $14,313.42. Because this amount was within the agreed margin of error of $15,000 stipulated to in the agreement, the court determined that the plaintiff was not entitled to a credit against the purchase price.[7] In addition, the court found that the plaintiff had not tendered to the defendants $102,500 on or before July 31, 2001, to render the note paid in full. The court concluded that the plaintiff was not entitled to a release of the security on the note and, consequently, not entitled to damages pursuant to § 49-8 (c) or a judgment that he was not liable to the defendants for further payments. We agree with the court and, accordingly, affirm the judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] Moreover, the court noted that on June 29, 2001, the plaintiff filed a petition in bankruptcy on behalf of the corporation. By the plaintiff's own admission, many of the debts for which he claimed a credit had been discharged by the Bankruptcy Court.